IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division - IN ADMIRALTY

FILED
JUL 2 2 2020
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

CMA CGM S.A.,

    Plaintiff,

v.                                    CIVIL ACTION NO. 2:19-cv-357

LEADER INT'L EXPRESS CORP.
a/k/a Leader International Express, Inc.,

    Defendant.

*MEMORANDUM OPINION AND ORDER*

Before the Court are Leader Int'l Express Corp.'s ("Leader") Motion for Summary Judgment and CMA CGM S.A.'s ("CMA") Cross-Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. ECF Nos. 18, 20. Both parties filed supporting memoranda and exhibits in support of their motions. ECF Nos. 18–22. Having been fully briefed, this matter is ripe for judicial determination.

    **I.    FACTUAL AND PROCEDURAL HISTORY**

This litigation concerns a breach of a maritime contract ("service contract") between Leader, a non-vessel operating common carrier ("NVOCC"), and CMA, a vessel operating common carrier, for failure to pay demurrage, detention, and related charges for containers subjected to a lengthy custom hold. ECF No. 1 at ¶ 4–6; ECF No. 19 at ¶ 1. The following facts are undisputed: On May 18, 2016, CMA and Leader entered into a service contract where CMA, the carrier, would ship cargo for Leader, the shipper, with Leader to pay for shipping and guarantee a minimum quantity of containers to ship. The service contract incorporated CMA's tariffs CMDU

1

037, 020, 100, and 044, as well as the terms and conditions of its bill of landing.[1] ECF No. 19 at ¶ 2; ECF No. 21 at ¶ 5. Relevant here, the service contract provides that NVOCC is responsible to the carrier for fees incurred for shipments, including detention and demurrage. ECF No. 19 at ¶ 6.

Detention is "the charge the Merchant pays for detaining Carrier equipment outside the port, terminal or depot, beyond the free time." ECF No. 1-9 at 12; ECF No. 21 at ¶ 6(d). Demurrage is "the charge, related to the use of the equipment only, the Merchant pays for Carrier's equipment beyond the free time allowed by Carrier for taking delivery of goods in the port, terminal or depot." ECF No. 1-9 at 13; ECF No. 21 at ¶ 6(b). Demurrage includes storage, equipment, and reefer service costs. *Id.* Gates fees charged by the Marine Terminal Operator ("MTO") are an additional demurrage cost. ECF No. 21 at ¶ 6(f).

CMDU 100, Rule 200 and CMDU 100, Rule 300 set forth the terms for detention and demurrage. ECF No. 19 at ¶ 4. The applicable detention rate for booking is $115 per day except for permitted free time through day 10, and then $165 per day thereafter. ECF No. 21 at ¶ 6(e); ECF No. 1-3. The demurrage rate for bookings is $160 per day except for permitted free time. ECF No. 21 at ¶ 6(c); ECF No. 1-2. Free time consists "of the day the equipment is interchanged plus the next four working days: Saturdays, Sundays and holidays shall be excluded. Upon expiration of free time, per diem charges [are] assessed on a straight calendar day basis until the equipment is returned." ECF No. 1-3 (CMDU 100, Rule 300). The daily charge for carrier equipment containers kept beyond the free time, includes 5 free working days in all U.S. ports, absent exceptions. ECF No. 19 at ¶ 4; ECF No. 1-2 (CMDU 100, Rule 200). There is no free time for

---

[1] The Service contract was amended five times. ECF No. 21 at 4; *see also* ECF Nos. 1-4 to 1-9 (Exs. 3A–3F).

2

both demurrage and detention for containers returned empty to carrier.[2] ECF No. 21 at ¶6(i); ECF No. 1-10 at 4, 7, and 10.

The service contract also incorporates provisions regarding custom delays. Tariff 044, Rule 2.39 reads that the carrier "shall not be responsible for delays in transporting or delivering cargo when such delays occur on cargo detained by Customs, quarantine officials or other government required cargo inspection organizations. Any demurrage charges that accrue from such delays either at origin or destination are for the account of cargo." ECF No. 21 at ¶ 6(h); ECF No. 19-11. For return cargo, the tariff reads, "[w]hen Carrier is required by U.S. Customs or any other legal entity to return cargo to the port of loading, for whatever reason, all charges including return carriage and additional onward carriage, plus the original freight charges are for the account of the Shipper." *Id.* "Any and all costs associated with or arising out of any such inspection, including but not limited to, spotting of container at the inspection point, storage of the container while awaiting inspection or thereafter, opening and closing container, manipulation of the contents of the container, opening and replacing packages, and taking samples shall be for the expense of the Cargo." *Id.*

Finally, the service contract includes a force majeure provision. According to the service contract, force majeure includes "strikes, lock-outs or exceptional circumstances arising from the threat thereof, acts of God, state or public enemy, including but not limited to war, riots, civil disorder and insurrection, embargo or other disruption or interference with trade, act of the Prince, marine disaster, severe weather, condition, fire, explosion, or other casualty, and any unforeseen

---

[2] Tariff 100, Rule 90A excludes free time for both demurrage and detention for containers returned empty to carrier and reads "[u]nits returned empty due to a reduction in or delayed loading of the expected units for a booking shall have no Free Time Detention (off dock terminal/CY), and no Free Time Demurrage (on dock terminal/CY). Shipper or responsible party will be liable for any and all of these accrued charges as per Tariff." ECF No.1-10.

3

event beyond the control of the parties of whatever nature and however caused which materially affect business of trading conditions and/or the supply or demand for the services of Carrier or the cargo of the Shipper." ECF No. 1-9 at Term 12. The party affected by force majeure circumstances, "shall notify the other party in writing within seven (7) working days of the existence of such circumstances, specifying the effect of those circumstances on the party's ability to perform its obligations." ECF No. 21 at ¶ 6(g); ECF Nos. 1-4 to 1-9. In addition, the force majeure provision excuses the carrier from responsibility from any delay, damage, injury or expense "in the event the carrier is prevented from U.S. Customs or any other government entity from unloading some or all of the cargo on a particular vessel and such prohibition is not due to any act or omission of [c]arrier [and is] due to no fault of the carrier." *Id.* All extra charges and expenses incurred as a result of such prohibition are for the account of the shipper. *Id.*

In May 2016, Leader began a relationship with Perfectus Aluminum, Inc. ("Perfectus") to ship large numbers of containers, which contained a commodity called alloyed aluminum extensions from the Port of Long Beach to Asia. ECF No. 19 at ¶ 7. Leader used CMA as one of the carriers to ship Perfectus containers. *Id.* at ¶ 8. Specifically, Leader booked 103 containers with CMA. *Id.* at ¶ 8–9; ECF No. 21 at ¶ 9.

On September 15, 2016, the United States Customs and Border Protection ("CBP"), in connection with a criminal investigation into Perfectus, held and detained the 103 containers that Leader arranged to ship with CMA.[3] ECF No. 19 at ¶ 9; ECF No. 21 at ¶ 11. CBP prohibited CMA from notifying Leader of the hold until after the containers were delivered to the terminal.

---

[3] The federal government investigated Perfectus for avoiding import tariffs on massive quantities of aluminum extrusions imported from China, tariffs designed to avoid the dumping of raw materials into the United States. ECF No. 19 at ¶ 13. Defendant claims no prior ties to or knowledge about the Perfectus group prior to being approached by Perfectus to provide NVOCC services for shipments to Asia. ECF No. 19 at ¶¶ 13–15.

*Id.*; ECF No. 21 at ¶ 12. Containers subjected to the CBP hold could not load on the vessel as scheduled, and CMA administratively "rolled" them to the next available and appropriate vessel during the hold. ECF No. 19 at ¶ 12.

On September 19, 2016, CMA issued a notice to Leader regarding the CBP hold on containers already booked and released. ECF No. 21 at ¶13. CMA subsequently issued two other notices to Leader on October 3, 2016. *Id.* at ¶ 14–15. From September 19, 2016 to January 9, 2017, CMA sent Leader at least 20 additional notices and booking sheets addressing the custom holds placed on containers booked by Leader. ECF No. 21 at ¶ 16. Leader did not issue the force majeure notice required to seek relief under the service contract. ECF No. 21 at ¶ 20.

Eventually, 49 containers were shipped. ECF No. 19 at ¶ 16. CMA and Leader arranged for the released containers to ship in October and November 2016, and a few containers were shipped in March 2017. *Id.* For these shipped containers, Leader paid freight and other charges, and $257,703 in demurrage charges. *Id.* at ¶ 17. CMA seeks $144,537 as the balance of demurrage charges for the shipped containers. *Id.*

On January 9, 2017, CBP officially seized the remaining 54 containers that Leader booked with CMA. *Id.* at ¶ 18. These unshipped containers were released empty to CMA on various dates in January and February 2017. *Id.* at ¶ 19. In August 2017, CMA invoiced Leader for late fees, detention and demurrage for the 54 containers. ECF No. 19 at ¶ 20. CMA charged detention for the 54 containers from the day the containers were picked up and left at the terminal until in-gating, and demurrage from the day from container delivery/in gating to the terminal until the day the container was released empty to CMA. *Id.* CMA did not provide free time for demurrage or detention for the containers returned empty. ECF No. 21 at ¶ 20. For the 54 unshipped containers,

5

CMA assessed 7,216 demurrage days. ECF No. 19 at ¶ 20. CMA seeks $1,154,560.00 as demurrage charges for the 54 unshipped containers. *Id.* at ¶ 21.

The MTO unilaterally reduced its contract charges for container storage for unshipped containers and stopped charging on the date of seizure. *Id.* at ¶ 22. The MTO cancelled two invoices for storage charges for two of the three shipments of sailed containers. *Id.* The MTO total invoices to CMA for storage costs for the containers at issue amounts to $213,366. *See* ECF No. 21 at 7; ECF No.22 at 3. Perfectus has made no payments to Leader for CMA.[4] ECF No. 19 at ¶ 24. Leader has not paid any of the demurrage, detention, or gate fee charges for the unshipped containers. ECF No. 21 at ¶ 23.

After unsuccessfully attempting to secure payment from Leader, CMA initiated the instant action on July 10, 2019, claiming breach of contract and seeking $1,310,139.68 USD in damages. ECF No. 1. On August 26, 2019, Leader filed its Answer with affirmative defenses. ECF No. 10. Specifically, Leader claimed force majeure and unclean hands as defenses, but reserved the right to amend its answer to include other defenses as it became available or apparent during discovery. *Id.* at 6–7.

On March 3, 2020, Leader filed a Motion for Summary Judgment and a supporting memorandum. ECF Nos. 18–19. In its supporting memorandum, Leader dispensed with its unclean hands' argument, but maintained its force majeure defense. ECF No. 19 at 24–28. Leader also asserted two new affirmative defenses –Frustration of Purpose and Impossibility. *Id.* at 8–24.

On March 10, 2020, CMA filed a Cross-Motion for Summary Judgment and its memorandum in opposition. ECF Nos. 20–21. On March 16, 2020, Leader filed its reply, and its opposition to CMA's Cross Motion for Summary Judgment. ECF No. 22. CMA did not file a reply.

---

[4] Perfectus settled with the other two carriers Leader did business with. ECF No. 19 at ¶ 25. Perfectus fled the U.S., are beyond extradition, and have not been prosecuted. *Id.*

6

On May 22, 2020, Leader filed a notice of supplemental authority regarding a new rule by the Federal Maritime Commission ("FMC"), which though not controlling, is relevant to the cross-motions for summary judgment. ECF No. 24.

## II. LEGAL STANDARD

Federal Rules of Civil Procedure provides that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a); *see also McKinney v. Bd. of Trustees of Md. Cmty. Coll.*, 955 F.2d 924, 928 (4th Cir. 1992) ("[S]ummary judgments should be granted in those cases where it is perfectly clear that no issue of fact is involved and inquiry into the fact is not necessary to clarify the application of the law.") (citations omitted). In deciding a motion for summary judgment, the court must view the facts, and inferences to be drawn from the facts, in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When considering cross-motions for summary judgment, the Court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (*quoting Philip Morris, Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 586–87 (internal quotations omitted). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Genuineness means that the evidence must create fair doubt;

wholly speculative assertions will not suffice." *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), abrogated on other grounds by, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *see also Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir. 1986) (noting that the nonmoving party must offer more than unsupported speculation to withstand a motion for summary judgment).

### III. DISCUSSION

In a breach-of-contract action, summary judgment is appropriate where the language of the contract is unambiguous or "where an ambiguity can be definitely resolved by reference to extrinsic evidence." *Washington Metropolitan Area Transit Authority v. Potomac Investment Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007). Here, the parties do not dispute any material facts, and agree that the service contract which incorporates the tariffs and the bill of landing, governs their duties. The parties also do not dispute that the service contract is unambiguous. Rather, the parties dispute whether an equitable doctrine excuses the parties from their contractual obligations. *Compare* ECF No. 19 *with* ECF No. 21.

Leader raises three defenses in support of its motion for summary judgment. First, Leader claims that Leader should be relieved from its contractual performance because the purpose of the contract was frustrated, and therefore relies on the frustration of purpose doctrine. ECF No. 19 at 8–24. Second, Leader relies on the doctrine of impossibility to relieve it of its contractual obligation under the service agreement. *Id.* Lastly, and in the alternative, Leader argues that the force majeure clause outlined in the service contract excuses Leader from the demurrage charges assessed by CMA. *Id.* at 24–28.

In opposition, and in support of its own motion for summary judgment, CMA argues that Leader breached the service contract and that no affirmative defense applies in this case. ECF No.

8

21. Specifically, CMA argues that Leader waived its right to bring the affirmative defenses of frustration of purpose and impossibility by failing to waive these defenses in its Answer. ECF No. 21 at 12–20. CMA also argues that Leader cannot rely on force majeure terms when it failed to adhere to the required written notice. ECF No. 21 at 20–24. CMA requests that this Court grant summary in their favor for breach of contract. *Id.* at 24–27.

### 1. Waived Affirmative Defenses

The Court begins its analysis by first addressing CMA's procedural argument about whether Leader waived its affirmative defenses by raising it for the first time in a summary judgment motion. ECF No. 21 at 12–15. Federal Rule of Civil Procedure 8(c) requires that "a party must affirmatively state any avoidance or affirmative defense" in response to a pleading. Fed. R. Civ. P. 8(c). The purpose of Rule 8(c) is to give the opposing party notice of the affirmative defense and a chance to rebut it. *Grunley Walsh U.S., LLC v. Raap*, 386 F. App'x 455, 459 (4th Cir. 2010). Therefore, a party's failure to raise an affirmative defense in the appropriate pleading generally results in a waiver. However, a waiver of an affirmative defense is not automatic and requires a showing of prejudice to the plaintiff or unfair surprise. *Peterson v. Airline Pilots Ass'n*, 759 F.2d 1161, 1164 (4th Cir. 1985). Thus, "[a]bsent unfair surprise and prejudice to a plaintiff...a defendant may raise an affirmative defense for the first time in a dispositive pre-trial motion." *Babb v. Lee Cty. Landfill SC, LLC*, 298 F.R.D. 318, 323 (D.S.C. 2014).

Here, the Court does not find that CMA is unfairly surprised or prejudiced by Leader raising affirmative defenses for the first time in a summary judgment motion. First, CMA had notice from the Answer that Leader reserved the right to raise additional offenses at the close of discovery. While Leader did not specifically name these defenses in the Answer or seek leave to amend the Complaint before filing its summary judgment motion, Leader put CMA on notice by

9

raising these affirmative defenses in a pleading where CMA had an opportunity to respond. *See Grunley Walsh U.S., LLC*, 386 F. App'x at 459 (finding no prejudice or unfair surprise because the merits of the affirmative defense raised for the first time in a summary judgment motion was fully briefed). Though CMA argues that they are prejudiced because they lost the opportunity to issue interrogatories, request for admissions, or request for production to examine the specific defenses raised for the first time in a summary judgment motion, the Court does not find any additional discovery needed to address these affirmative defenses given the undisputed facts. *See* ECF No. 21 at 12–13; *see also* ECF No. 22 at 7. This is further demonstrated by CMA's ability to rebut these defenses in its opposition to Leader's motion for summary judgment by relying on the undisputed facts. ECF No. 21 at 15–20. In other words, based on the undisputed facts before the Court, no additional discovery is needed to determine whether the equitable defenses apply in this case, and CMA has failed to demonstrate otherwise. Therefore, the Court finds that CMA is not prejudiced, and will address Leader's affirmative defenses based on the merits.[5]

### 2. Frustration of Purpose

Leader's first affirmative defense is that the purpose of the service contract was frustrated. ECF No. 19 at 8–24. Frustration of purpose is an equitable doctrine that works to discharge a party from its outstanding contractual obligation due to a supervening frustration. *Caper Corp. v. Wells Fargo Bank, N.A.*, 578 F. App'x 276, 288 (4th Cir. 2014) *citing* Restatement (Second) of Contracts § 265. The doctrine is narrow and applies to instances "where a wholly unforeseeable event renders the contract valueless to one party." *Id. citing United States v. Gen. MacArthur Senior Village, Inc.*, 508 F.2d 377, 381 (2d Cir. 1974). The defense of frustration of purpose requires proof of

---

[5] The Court notes that Leader may also request leave to amend its Answer to add the specific affirmative defenses. However, given the undisputed facts in this case, the Court finds that this is unnecessary. Raising the affirmative defenses for the first time in a summary judgment motion is sufficient where plaintiff is neither unfairly surprised nor prejudiced.

three elements: 1) frustration of the principal purpose of the contract; 2) the frustration is substantial; and 3) the non-occurrence of the frustrating event or occurrence was a basic assumption on which the contract was made. *Drummond Coal Sales, Inc. v. Norfolk S. Ry. Co.*, No. 7:16CV00489, 2018 WL 4008993, at *15 (W.D. Va. Aug. 22, 2018). "[I]n order for frustration of the principal purpose of a contract to be substantial, it 'must be so severe that it is not fairly to be regarded as within the risks ... assumed under the contract.'" *Drummond Coal Sales, Inc.*, 2018 WL 4008993 at *15 *citing Sabine Corp. v. ONG W., Inc.*, 725 F. Supp. 1157, 1179 (W.D. Okla. 1989). "It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss." *Id. citing* Restatement (Second) of Contracts § 265 (comment (a)).

Here, Leader argues that the purpose of the contract was frustrated when the parties were unable to ship the 54 containers of cargo that CBP held and seized through no fault of the parties. ECF No. 19 at 13. Leader argues that while it is familiar with short-term delays in shipping due to CBP inspections and related charges, lengthy custom holds and seizures at the terminal due to a federal criminal investigation are rare, and therefore unforeseeable. *Id.* at 15. Leader argues that this risk was not incorporated into the contract. *Id.* CMA, on the other hand, argues that the parties did allocate the risk by incorporating the tariffs that cover detention and demurrage, and custom delays. ECF No. 21. Leader contends that these provisions apply to containers that ship, not unshipped containers. ECF Nos. 19, 22.

The Court has doubts as to whether the purpose of the contract was frustrated in this case with regards to the 54 unshipped containers. Even if the purpose of the contract was frustrated with regards to the unshipped containers, however, Leader fails to demonstrate that any frustration of

the contract was substantial. Leader also fails to demonstrate that the non-occurrence of the frustrating event or occurrence was a basic assumption on which the contract was made.

Tariff 044, Rule 2.39, which is incorporated into the contract, reads that the carrier "shall not be responsible for delays in transporting or delivering cargo when such delays occur on cargo detained by Customs, quarantine officials or other government required cargo inspection organizations. Any demurrage charges that accrue from such delays either at origin or destination are for the account of cargo." ECF No. 21 at ¶ 6(h); ECF No. 19-11. This tariff also provides that "[w]hen carrier is required by U.S. Customs or any other legal entity to return cargo to the port of loading, for whatever reason, all charges including return carriage and additional onward carriage, pays the original freight charges are for the account of the shipper." ECF No. 19-11. Finally, the provision also provides that "[a]ny and all costs associated with or arising out of any such inspection, including but not limited to, spotting of container at the inspection point, storage of the container while awaiting inspection or thereafter, opening and closing container, manipulation of the contents of the container, opening and replacing packages, and taking samples shall be for the expense of the Cargo." *Id.*

The language of this tariff, and the parties agree, is unambiguous, and applies when CBP detains cargo. Though Leader argues that this provision does not apply to situations "when the carrier is *unable* to transport or deliver cargo," ECF No.19 at 23, the Court finds otherwise. The tariff applies generally to CBP detentions and holds. The existence of the tariff itself, which is incorporated in the service contract, indicates that custom delays occur in the maritime industry, and Leader does not deny this. *See* ECF No. 19 at 15. Though Leader claims that a lengthy custom delay is rare and unanticipated, the parties allocated the risk of custom delays, regardless of how long the delay. The tariff also applies when cargo is seized. *CMA CGM S.A. v. AZAP Motors, Inc.*,

No. 2:14CV504, 2015 WL 9601157, at *9 (E.D. Va. Nov. 25, 2015), report and recommendation adopted, No. 2:14CV504, 2016 WL 50926 (E.D. Va. Jan. 4, 2016) (holding that a similar provision applies when cargo is seized by customs). In any custom inspection, hold, or detention, it is always possible that the items will be seized. The purpose of addressing custom holds and detentions in the service contract was to allocate the risk if there were any delays or seizures, and Leader assumed this risk, regardless of where the seizure took place. *See* ECF No. 19-11 (noting that "[a]ny and all costs associated with or arising out of any such inspection, *including but not limited to*... manipulation of the contents of the container...and taking samples shall be for the expense of the Cargo") (emphasis added). While the Court understands that the custom seizure was unfortunate placing both parties in difficult situations, these risks were assumed under the contract. *See Drummond Coal Sales*, 2018 WL 4008993, at *15. Therefore, the frustration of purpose doctrine does not apply in this case.

### 3. Impossibility/ Impracticability

Leader also raises the doctrine of impossibility as an affirmative defense. Though Frustration of purpose and impossibility are legally distinct defenses, they are related, and the elements are similar. *See Drummond Coal Sales*, 2018 WL 4008993, at *15. To prove the defense of impossibility of performance, a defendant must prove: (1) the unexpected occurrence of an intervening act; (2) such occurrence was of such a character that its non-occurrence was a basic assumption of the agreement of the parties; and (3) the occurrence made performance impracticable. *Fla. Power & Light Co. v. Westinghouse Elec. Corp.*, 826 F.2d 239, 264 (4th Cir. 1987). In considering the non-occurrence of an event, the question is whether the event is "one which the parties could reasonably be thought to have foreseen as a real possibility which could affect performance." *Opera Co. of Bos. v. Wolf Trap Found. for Performing Arts*, 817 F.2d 1094,

13

1102 (4th Cir. 1987). Thus, foreseeability is just one factor to be considered in resolving how likely the occurrence of the event in question is. *Id.* The other factor is whether the occurrence of the event, "based on past experience, was of such reasonable likelihood that the obligor should not merely foresee the risk but, because of the degree of likelihood...should have guarded against it or provided for non-liability against the risk." *Id.*

Based on the Court's analysis above, the Court finds that the doctrine of impossibility is inapplicable. It is foreseeable that with any custom inspection, there is a possibility that the delay would be lengthy or result in the ultimate seizure of the cargo. Given their experience in the maritime industry, the parties incorporated several provisions dealing with Custom inspections, delays, and actions. As the Court noted previously, the parties allocated the risks in the event Customs interfered with shipments, whether by delay or seizure. Leader assumed that risk in the contract, and therefore, the doctrine of impossibility also does not apply.

### 4. Force Majeure

In interpreting any force majeure provision, courts must construe contracts as they are written. *Vienna Metro LLC v. Pulte Home Corp.*, 786 F. Supp. 2d 1076, 1086 (E.D. Va. 2011) *citing Christopher Assocs. v. J.C. Sessoms, Jr.*, 245 Va. 18, 22 (1993). Where a force majeure provision is clear and unambiguous, the provision will be enforced. *Washington Metropolitan Area Transit Authority*, 476 F.3d at 235; *Philip Morris USA, Inc. v. Appalachian Fuels, LLC*, No. 3:08-CV-527, 2009 WL 1011650, at *7 (E.D. Va. Apr. 15, 2009). This includes any enforcement of notice provisions that the parties agreed to. *See United States v. Sunoco, Inc. (R & M)*, No. CIV.A. 03-4625, 2007 WL 1652266, at *4 (D.N.J. June 7, 2007) (noting that failure to provide adequate notice of force majeure renders the defense unavailable); *Sabine Corp. v. ONG W., Inc.*, 725 F.

Supp. 1157, 1168–69 (W.D. Okla. 1989) (noting that the failure to give proper notice is fatal to a defense based upon a force majeure clause requiring notice).

Here, the service contract provides that in the event of force majeure, "the party affected by the force majeure shall notify the other party in writing within seven (7) working days of the existence of such circumstances, specifying the effect of those circumstances on the party's ability to perform its obligations." ECF No. 21 at ¶ 6(g); ECF Nos. 1-4 to 1-9. Leader did not issue any notice regarding the force majeure provision. However, Leader argues that the notice requirement should be excused because it did not become apparent that there was a force majeure event until after the items were officially seized. ECF No. 19 at 26. Given the clear and unambiguous terms of the force majeure provision, the Court does not find a full waiver of the notice requirement appropriate in this case.

Furthermore, the Court does not consider the lengthy custom delay which resulted in seizure of cargo to fall under the provision of force majeure. Included within the force majeure section is a provision excusing the carrier from responsibility of any delay, damage, injury or expense in the event the carrier is prevented from U.S. Customs or any other government entity "from unloading some or all of the cargo on a particular vessel and such prohibition is not due to any act or omission of [c]arrier, which is due to no fault of the carrier..." *Id.* All extra charges or expenses incurred as a result of such prohibition are for the Shipper's account. *Id.* The existence of this provision under the force majeure provision indicates not only that the parties allocated the risk for any governmental or custom interference, but also that the parties did not consider this event to be fully excused by the force majeure provision. Leader agreed to assume the risks associated with any custom delays and therefore, the force majeure provision is inapplicable for this reason as well.

### 5. Breach of Contract

The Court now turns to CMA's Cross-Motion for Summary Judgment regarding its breach of contract claim. To prove a breach of contract claim, a party must prove the existence of the following elements: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Middle E. Broad. Networks, Inc. v. MBI Glob., LLC*, No. 1:14-CV-01207-GBL, 2015 WL 4571178, at *4 (E.D. Va. July 28, 2015) *citing Filak v. George*, 267 Va. 612, 594 S.E.2d 610, 614 (2004.) Courts must interpret the contract according to the plain meaning of the terms, giving effect to all words, and must not search for meaning outside the contract, where the agreement is complete on its terms. *Design & Prod., Inc. v. Am. Exhibitions, Inc.*, 820 F. Supp. 2d 727, 736 (E.D. Va. 2011) (citation omitted).

There are no genuine disputes as to any material fact regarding Leader's liability for costs arising from the seizure of cargo by CBP. Both parties agree that the service contract, which incorporates its tariffs and bill of lading, governs the contractual obligations between the parties. ECF Nos. 19, 21.CMA claims that Leader failed to pay the detention and demurrage costs associated with the CBP seizure. ECF No. 21. Leader admits that it failed to pay the demurrage and detention costs for unshipped containers, and a partial balance for the shipped containers, but that it did not have to pay due to equitable defenses. ECF Nos. 19, 22. As analyzed above, the Court does not find that any equitable defenses apply in this case. Therefore, Defendant has breached the terms of the contract by failing to pay detention and demurrage charges in connection with the CBP detention. As a result of this breach, Leader owes, and is ordered to pay CMA **$1,310,139.68**. *See* ECF No. 21-10.

## IV. CONCLUSION

Based on the foregoing reasons, Defendant's Motion for Summary Judgment is **DENIED**.

Plaintiff's Cross-Motion for Summary Judgment is **GRANTED**.

The Court **DIRECTS** the Clerk to provide a copy of this Order to the parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
July 21, 2020

/s/
Raymond A. Jackson
United States District Judge